744 F.2d 1107
 SOUTH CENTRAL BELL TELEPHONE COMPANY, Plaintiff-Appellee,
v.
LOUISIANA PUBLIC SERVICE COMMISSION, Thomas E. Powell,
George J. Ackel, Ed Kennon, Louis Lambert and John
G. Schwegmann, Jr., Defendants-Appellants.
 No. 83-3494.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 11, 1984.
 
 Stone, Pigman, Walther, Wittmann & Hutchinson, Paul L. Zimmering, Michael R. Fontham, New Orleans, La., Marshall B. Brinkley, La. Public Serv. Comm., Baton Rouge, La., for defendants-appellants.
 Jones, Walker, Waechter, Poitevent, Carrere & Denegre, James P. Browning, Jr., Herschel Abbott, Jr., M. Robert Sutherland, Charles G. Rivet, New Orleans, La., for plaintiff-appellee.
 John E. Ingle, Nancy Stanley, F.C.C., Washington, D.C., for amicus F.C.C.
 Appeal from the United States District Court for the Middle District of Louisiana.
 Before GEE, RANDALL and JOHNSON, Circuit Judges.
 RANDALL, Circuit Judge:
 
 
 1
 The Louisiana Public Service Commission appeals a modified preliminary injunction of the District Court for the Middle District of Louisiana requiring the Louisiana Public Service Commission to grant an increase in intrastate telephone rates sufficient to allow the South Central Bell Telephone Company to cover increased operating expenses of $40,506,000 resulting from the implementation of depreciation rates and methodologies prescribed by the Federal Communications Commission. The district court issued its order upon finding that the Louisiana Public Service Commission had failed to comply with an earlier, non-dollar specific preliminary injunction requiring the Louisiana Public Service Commission to utilize the federally mandated depreciation practices. Because we conclude that the district court acted within its authority and discretion in issuing the modified injunction, we affirm.
 
 I. BACKGROUND
 
 2
 A. Basic Principles of Public Utility Ratemaking.
 
 
 3
 Because this case involves the role of depreciation rates and methodologies in determining the revenue requirements of a regulated utility, we begin by briefly reviewing certain basic principles of regulatory ratemaking.[1] Public regulatory commissions have the responsibility of ensuring that regulated utilities on the one hand do not receive monopolistic returns but on the other hand do recover sufficient revenues to pay legitimate expenses and to provide a rate of return on investment that will compensate present investors and attract new capital when needed. In determining a rate structure that will adequately meet a utility's prospective revenue requirements, a regulatory commission makes predictions based on the utility's revenues, expenses, and investments in some selected previous year, called the "test year." Although the normal costs of service incurred by a utility will usually increase from year to year, the test year serves as a reasonably accurate basis for estimating future operating expenses and return requirements because the increasing costs generally will be offset, at least theoretically, by additional revenue supplied by new customers. Once the cost of service for the test year is adjusted for any extraordinary change expected to occur in the upcoming year, the regulatory commission is able to calculate tariffs relying on test year figures as representative of future revenue requirements.
 
 
 4
 A utility's "rate base" is the total amount of its investments in providing its service, including its investment in working capital for the test year. The utility's earnings, or the amount returned on investment, is its revenues minus its expenses. The utility's rate of return is therefore determined by dividing the utility's total investment by its earnings. Thus, an increase in a utility's expenses requires a corresponding increase in a utility's revenues in order for the rate of return to remain constant. Similarly, an adjustment in the utility's rate of return necessitates a corresponding adjustment in the utility's revenues, assuming expenses and investment remain the same.
 
 
 5
 In determining the expenses incurred by a utility in the test year, regulatory agencies use principles of depreciation accounting. Under these principles the cost of an asset having a useful life of more than one year is not counted as an expense in the year incurred. Rather, the costs are capitalized and spread over that period of time during which the item is in service. The costs of the asset are then recouped from future ratepayers through depreciation charges. A change in the depreciation rate, therefore, results in a change in the expenses incurred during the first years of the asset's useful life, although of course, as long as the prediction of useful life is accurate, the total amount of expenses incurred over the asset's useful life would remain the same. The purpose of depreciation accounting is to match costs with the revenues they generate. Expenditures for long-lived assets are thought to be more properly charged over the various periods in which the assets are useful in the production of revenues. See generally Docket No. 20,188, 83 F.C.C.2d 267, 270-71 (1980).
 
 
 6
 B. FCC Regulations on Depreciation.
 
 
 7
 Regulatory power over the telecommunications industry is exercised by both federal and state governments. In 1934, Congress enacted the Communications Act of 1934, 47 U.S.C. Sec. 151, et seq., "to make available, so far as possible ... a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. Sec. 151. To achieve this goal, Congress gave the Federal Communications Commission (FCC) regulatory authority to establish depreciation practices and to require the keeping of prescribed accounts.[2] The FCC's power, however, was carefully curtailed not to extend to intrastate communications.[3] Under the Communications Act, state regulatory commissions, such as the Louisiana Public Service Commission, retain the authority to regulate intrastate rates, facilities, and practices of the telecommunications industry. See La. Const. art. IV, Sec. 21; La.Rev.Stat.Ann. Sec. 45:1161, et seq.
 
 
 8
 In 1980, after seven years of study, the FCC adopted the "remaining-life" and "straight-line equal life group" (SLELG) depreciation methods. Docket No. 20,188, 83 F.C.C.2d 267 (1980), on reconsideration, 87 F.C.C.2d 916 (1981). According to the FCC, use of these depreciation methods would "calibrate more closely the flow of revenues with the recovery of capital," 83 F.C.C.2d at 281, and thus provide communications utilities with additional cash flow needed to meet the construction requirements of a rapidly changing technology.[4] The FCC acknowledged that use of the accelerated depreciation methods would result in increased revenue requirements over the short term, but stated that "the relative size of the increment will be repaid many times over in future years as the ability of regulated telephone companies to provide '... rapid, efficient ... communication service with adequate facilities at reasonable charges is enhanced.' "[5] Id. For similar reasons, the FCC in 1981 ruled that station connections were to be expensed immediately instead of capitalized and recovered over their useful life through depreciation. Docket No. 79-105, 85 F.C.C.2d 818 (1981).
 
 
 9
 In April 1982, the FCC, in response to a petition for clarification submitted by the National Association of Regulatory Utility Commissioners (NARUC), declared that its prior rulings on depreciation methodologies and station connections were not applicable to the states. 89 F.C.C.2d 1094 (1982). Refusing to repudiate forty years of administrative practice and court precedent, the FCC ruled that, "when state regulation is reconcilable with federal policies or rules, there is no occasion for us to override state agency actions in furtherance of legitimate state regulatory objectives."[6] Id. at 1108.
 
 
 10
 Following the FCC's preemption ruling, on June 7, 1982, the American Telephone and Telegraph Company (AT & T), on behalf of itself and associated Bell System Operating Companies, filed a petition for reconsideration. On the same day, General Telephone Company of Ohio sought a "declaratory ruling" ordering the Public Utilities Commission of Ohio to use the same depreciation rates for intrastate purposes as had been prescribed by the FCC. After a joint reply period for the two petitions, the FCC, in a "Memorandum Opinion and Order" released on January 6, 1983 (Preemption Order), reversed itself and declared that its "depreciation policies and rates, including the expensing of inside wiring, preempt inconsistent state depreciation policies and rates." 92 F.C.C.2d 864, 880 (1983). The FCC based its Preemption Order on both the preemptive effect of Sec. 220 of the Act and the agency's own regulatory power.[7] Although conceding that its depreciation methods would have an immediate upward impact on rates, the FCC reasoned that more timely capital recovery would encourage greater technological progress, which would, in turn, result in more efficient service and lower costs. According to the FCC, "[i]f competition is to be viable, it is necessary for prices to reflect depreciation expenses that are realistic for a competitive market." 92 F.C.C.2d at 877. The FCC concluded: "[W]e find it imperative to declare today that inconsistent state prescribed depreciation rates are preempted by the Communications Act and are accordingly void." 92 F.C.C.2d at 879.
 
 
 11
 C. The Proceedings Below.
 
 
 12
 On May 3, 1982, the South Central Bell Telephone Company (South Central Bell) filed tariff revisions with the Louisiana Public Service Commission (Louisiana Commission) seeking an increase in intrastate rates in the amount of $238,600,000. As partial justification for the increased revenues, South Central Bell relied on the FCC's adoption of remaining life and SLELG depreciation methods in 1980 and the FCC's ruling in 1981 requiring the expensing of station connections. At the time of the filing, the Louisiana Commission required both the use of certain depreciation practices that recovered the cost of an asset at an initially slower rate and the capitalizing, instead of expensing, of station connections. On or about January 7, 1983, the FCC mailed copies of its January 6 Preemption Order to the Louisiana Commission, and on January 19, 1983, the order was published in the Federal Register.
 
 
 13
 The Louisiana Commission on May 19, 1983, denied South Central Bell's request for a rate increase. In its order, the Louisiana Commission expressed concern over Louisiana's declining economy and found the utility's current rate of return, about 13.5%, was comparable to the rate found reasonable in 1981. Thus, because the rates were not increased nor was the rate of return reduced, the Louisiana Commission clearly implied its refusal to implement FCC-prescribed depreciation methods.[8]
 
 
 14
 In response to the Louisiana Commission's refusal to increase intrastate rates, South Central Bell filed suit in federal district court seeking a preliminary and permanent injunction requiring the Louisiana Commission to implement the depreciation methodologies and the expensing of station connections mandated by the FCC. After a hearing, the district court found that it had jurisdiction under 47 U.S.C. Sec. 401(b) and that the prerequisites of that provision had been met. The district court, however, stated that, in light of the fact that intrastate ratemaking is still within the exclusive province of the states, the court would not order South Central Bell to implement specific tariffs. Instead, the court ordered South Central Bell to comply generally with the FCC Preemption Order and to set new rates within ten days. South Central Bell Tel. Co. v. Louisiana Public Service Comm'n, 570 F.Supp. 227, 232-34 (M.D.La.1983).
 
 
 15
 On July 7, 1983, the Louisiana Commission, pursuant to the preliminary injunction, issued an order setting new rates. In this order, the Louisiana Commission found that application of the FCC-prescribed accounting methods resulted in an increased expense level of $40,506,000. The Louisiana Commission, however, after reducing the rate of return from 13.5% to 12%, also found that an increase in revenue of only $12,700,000 was needed to meet those increased costs. The Louisiana Commission justified the reduction in the rate of return on the grounds that the prime rate had declined since 1981 and that 7.5% of South Central Bell's total capital was cost-free investment tax credits.[9] No evidence was received in connection with the July 7, 1983 order.
 
 
 16
 Soon thereafter, South Central Bell filed a motion in district court seeking to modify the preliminary injunction or, alternatively, to hold the Louisiana Commission in contempt. The district court, stressing the fact that the Louisiana Commission had not received any additional evidence, found that "the Commission had absolutely no justification for failing to order an increase in revenues sufficient to cover the increased operating costs of the company." 570 F.Supp. at 237. The district court stated:
 
 
 17
 The Public Service Commission, here has not complied with the order of this court. The Public Service Commission itself has determined that there is an increase in operating expenses of $40,506,000.00 and, unless there are reasonable and proper adjustments to be made, that increase in operating costs mandates an equivalent increase in revenues. Adjusting fair return on equity downward, in the absence of evidence justifying such an adjustment, was arbitrary and capricious--a simple exercise in arithmetic designed to minimize the increase in telephone rates.
 
 
 18
 Id. at 237-38. The court concluded that, based on the foregoing, it had no alternative but to accept the Louisiana Commission's finding that South Central Bell had increased expenses of $40,506,000 and to require the Louisiana Commission to increase rates sufficiently to cover that amount. The Louisiana Commission appeals.
 
 
 19
 II. DISCUSSION.
 
 
 20
 The Louisiana Commission challenges on appeal the modified preliminary injunction on grounds that (1) the statutory requirements of 47 U.S.C. Sec. 401(b) have not been met, (2) the district court failed to comply with traditional principles of equity in issuing the injunction, (3) the injunction sets intrastate rates in violation of the Communications Act, and (4) under well-established principles of comity the district court should have abstained from exercising jurisdiction over the case. We note at the outset that the Louisiana Commission does not challenge, and nor can we consider, the validity of the underlying FCC Preemption Order. As the district court correctly held, the exclusive mechanism for obtaining judicial review of FCC action is a direct appeal to the court of appeals pursuant to 28 U.S.C. Sec. 2342(1) and 47 U.S.C. Sec. 402(a).[10] See FCC v. ITT World Communications, Inc., --- U.S. ----, 104 S.Ct. 1936, 1939-40, 80 L.Ed.2d 480 (1984); Southwestern Bell Tel. Co. v. Arkansas Public Serv. Comm'n, 738 F.2d 901, 905 (8th Cir.1984). Thus, because this case concerns the validity of a preliminary injunction issued by the district court pursuant to Sec. 401(b), we assume for purposes of this appeal that the underlying Preemption Order is a legal and proper act of the FCC.[11]
 
 
 21
 A. Section 401(b).
 
 Section 401(b) provides as follows:
 
 22
 (b) If any person fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such person or the officers, agents, or representatives of such person, from further disobedience of such order, or to enjoin upon it or them obedience to the same.
 
 
 23
 Under Sec. 401(b), a party seeking enforcement of an FCC declaration may obtain an injunction upon a finding that (1) the declaration is an FCC "order" within the meaning of the Act, (2) the order was regularly made and duly served upon the defendant, (3) the defendant is in disobedience of the order, and (4) the party seeking the injunction has been injured by the defendant's disobedience. In the proceeding below, the district court found that all four of these prerequisites had been met. On appeal, the Louisiana Commission disputes the district court's findings that the January 6 Preemption Order (1) was an "order" and (2) had been "duly served," both within the meaning of the Act.[12]
 
 
 24
 1. The Meaning of "Order."
 
 
 25
 The Louisiana Commission presents what can be taken to be two distinct arguments for its position that the meaning of the word "order" in the statute does not encompass the FCC January 6 Preemption Order. First, the Louisiana Commission contends that the Preemption Order was issued merely to clarify the law and not to compel state regulatory commissions to take any action. Specifically, the Louisiana Commission asserts that the order merely is an interpretation of the preemptive effect of Sec. 220(b), which provides that the FCC "shall, as soon as practicable," make depreciation prescriptions. According to the Louisiana Commission, the Preemption Order is not binding and thus is unenforceable under Sec. 401(b).
 
 
 26
 In determining the effect of an administrative action, we must, of course, look beyond its label to its substance. See Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 908-09 (5th Cir.1983); Brown Express, Inc. v. United States, 607 F.2d 695, 700 (5th Cir.1979). If an administrative agency intends a declaration to be no more than an expression of its construction of a statute or rule, the declaration is "interpretive" in nature and does not have the full force of law. If, on the other hand, an agency acts in accordance with its legislatively delegated rulemaking authority, the declaration is "legislative" in nature and binding on all applicable persons. Chamber of Commerce of the United States v. OSHA, 636 F.2d 464, 468 (D.C.Cir.1980); Brown Express, Inc., supra, at 700; Joseph v. United States Civil Service Comm'n, 554 F.2d 1140, 1154 n. 26 (D.C.Cir.1977). In addition, administrative agencies may make rules of general application in individual adjudicative proceedings. See Shell Oil v. FERC, 707 F.2d 230, 235 (5th Cir.1983).
 
 
 27
 The district court held that the language of the Preemption Order "is plainly directed to all state regulatory bodies and plainly declares that their depreciation procedures must comply with FCC procedures." 570 F.Supp. at 236. We agree. The FCC adopted the Preemption Order in a rulemaking proceeding only after receiving a significant number of comments and reply comments.[13] Although the FCC stated in the course of the Preemption Order that Sec. 220(b) of the Communications Act automatically preempted state depreciation policies, the FCC also explicitly relied on its own legislatively delegated power to preempt. 92 F.C.C.2d at 875-80. Indeed, the FCC in the Preemption Order did far more than merely interpret the Act and relevant legislative history. The FCC analyzed the policies underlying its depreciation methodologies and concluded in no uncertain terms that "this Commission's depreciation policies and rates, including the expensing of inside wiring, preempt inconsistent state depreciation policies and rates."[14] Reading the Preemption Order as a whole, we have no doubt that in issuing the order the FCC intended not merely to advise the public on its interpretation of the preemptive effect of Sec. 220(b), but to preempt as a matter of substantive law inconsistent state practices.[15]
 
 
 28
 Second, the Louisiana Commission contends in effect that the FCC Preemption Order, regardless of its binding effect, is not enforceable under Sec. 401(b) because that provision only applies to those orders that are the product of an adjudicative proceeding. By making this argument, the Louisiana Commission is in effect inviting us to travel down the same path recently traversed by the First Circuit in New England Tel. & Tel. Co., supra. After carefully reviewing the arguments both in favor and against adopting such a narrow interpretation of Sec. 401(b), however, we find that we must decline this invitation and instead join the Eighth Circuit in upholding the authority of the district court under Sec. 401(b) to enforce the FCC Preemption Order. See Southwestern Bell Tel. Co., supra.
 
 
 29
 The First Circuit in New England Tel. & Tel. Co., supra, based its interpretation of "order" in Sec. 401(b) on several policy considerations.[16] The court expressed concern, first, that, if Sec. 401(b) were construed to allow enforcement of general FCC rules and regulations by private parties, the FCC's primary control over the enforcement of the Communications Act would be seriously undermined. Such a construction, second, would place the interpretation of the rules and regulations in the hands of the some 700 federal district judges, thus threatening the sound development of a coherent nationwide policy. Third, a broad construction of Sec. 401(b) would often result in fractionated review of intrastate rates by encouraging private parties to challenge in federal court discrete aspects of the state ratemaking procedure. Fourth, the court noted that allowing private parties to utilize Sec. 401(b) solely to enforce specific adjudicatory orders would make more intelligible the inability of district courts in Sec. 401(b) proceedings to consider the substantive validity of the underlying order.
 
 
 30
 While we acknowledge the importance of these policy considerations, we are not persuaded by them to adopt a restrictive construction of the statute. First, the First Circuit was not able to cite, and our own research fails to uncover, a single precedent in support of its interpretation.[17] At least two Supreme Court decisions, however, can be read as providing support for interpreting the term "order" in Sec. 401(b) to include administrative rules. In Ambassador, Inc. v. United States, 325 U.S. 317, 65 S.Ct. 1151, 89 L.Ed. 1637 (1945), the Supreme Court considered the validity of a preliminary injunction issued against hotels in violation of a tariff regulation imposed by the telephone company. The tariff regulation had been filed in compliance with an FCC rulemaking order and had not been specifically upheld by the FCC as reasonable. The Supreme Court, in sustaining the injunction, upheld the district court's determination that the defendant hotels were in violation of the regulation and found that the suit to enjoin the violation was authorized under "Sec. 401." Although the Court failed to specify the subsection of Sec. 401 to which it was referring, it is clear that the suit had to have been brought under Sec. 401(b) since Sec. 401(a) only authorizes a district court to enjoin violations of the Act itself.[18] If Sec. 401(b) is available to enforce tariff regulations filed pursuant to agency rulemaking, the section should surely be available also to enforce rules and regulations of the agency itself.
 
 
 31
 Furthermore, in Columbia Broadcasting System, Inc. v. United States (CBS), 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942), the Supreme Court held that FCC regulations were "orders" within the meaning of Sec. 402(a).[19] In asking us to construe "order" more narrowly in the context of Sec. 401(b) than did the Supreme Court in interpreting the neighboring Sec. 402(a), the Louisiana Commission faces the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning." Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932). See also Hotel Equities Corp. v. CIR, 546 F.2d 725, 728 (7th Cir.1976); Curry v. Block, 541 F.Supp. 506, 518 (S.D.Ga.1982), aff'd, 738 F.2d 1556 (11th Cir.1984). This presumption, of course, "is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." 286 U.S. at 433, 52 S.Ct. at 609.
 
 
 32
 CBS dealt with FCC regulations that precluded a broadcast station from obtaining a license if the station had entered into certain types of contracts with a broadcast network. CBS brought the action under Sec. 402(a) in order to secure judicial review of the regulation. In finding that the regulation was an order within the meaning of Sec. 402(a), the Supreme Court pointed out that, inasmuch as the regulations governed and had an immediate impact upon the contractual relations between the stations and the networks, the implementation of the regulation was not dependent on administrative action. The Court held that, therefore, in order to avoid the harm that would otherwise result from the execution of an illegal regulation, judicial review under Sec. 402(a) was appropriate. According to the Court, "[w]hen, as here, such regulations are promulgated by order of the Commission and the expected conformity to them causes injury cognizable by a court of equity, they are appropriately the subject of attack under the provisions of Sec. 402(a)." Id. 316 U.S. at 418-19, 62 S.Ct. at 1201.
 
 
 33
 The First Circuit, in considering CBS, found that the Court's reasoning did not apply to a Sec. 401(b) proceeding because the same considerations of fairness supporting a broad interpretation of "order" were not present in that context. We disagree. Substantial unfairness can result from either compliance with an improper regulation or noncompliance with a proper one. Especially in the context of a pervasively regulated industry, beneficiaries of a self-executing regulation should not be denied the intended effect of the regulation without recourse merely because the FCC has yet to institute enforcement proceedings. In the instant case, the FCC Preemption Order was issued in response to a perceived failure of the regulatory system to furnish the telephone industry with sufficient cash flow. If each telephone company must wait to receive this benefit until the FCC is able to institute individual enforcement proceedings, telephone companies may well suffer for a significant period of time the harm the Preemption Order was designed to prevent.
 
 
 34
 Second, we adopt a broad construction of Sec. 401(b) because we are not convinced that the policies put forward by the First Circuit are threatened seriously enough to outweigh the vital policies furthered by private enforcement of FCC rulemaking orders. The FCC has broad discretion to act through either case-by-case adjudication or the rulemaking process. SEC v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); Avoyelles Sportsmen's League, Inc., supra, at 909. Thus, if the FCC deems that enforcement of a certain policy is desirable on an individual basis, it certainly has the discretion to proceed other than by adopting a self-executing rule. To a large extent, therefore, the FCC itself can avoid private incursions upon its enforcement responsibilities. Moreover, through the use of agency intervention and amicus curiae briefs, as well as through the application of the doctrine of primary jurisdiction, the courts and the FCC should be able to prevent both significant inconsistent applications of FCC rules and serious judicial encroachment upon FCC responsibilities. See, e.g., American Trucking Ass'n v. ICC, 682 F.2d 487, 491 (5th Cir.1982) (primary jurisdiction allows court faced with an issue requiring the special expertise of an agency to suspend proceedings pending referral of the issue to the agency for official position).
 
 
 35
 Most importantly, however, we simply do not see how the FCC's responsibility in developing and enforcing a coherent communications policy would be significantly undermined by giving the FCC discretion to adopt self-executing rules and then to rely in part on private enforcement. We firmly believe, in fact, that under appropriate circumstances such an approach would promote significant federal interests in conserving limited agency resources and in accelerating the implementation of FCC rules and regulations. We can also envision situations in which only a private party would have a sufficient interest in the obedience of an FCC rule to institute an enforcement proceeding. Cf. FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 477, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940) (person with a financial stake in the granting of a license may be the only one with sufficient interest to seek judicial review).
 
 
 36
 In short, we find that both precedent and sound policy support a broad interpretation of Sec. 401(b) to allow private enforcement of FCC rules and regulations.[20] Therefore, we hold that the FCC Preemption Order is an order within the meaning of Sec. 401(b).[21]
 
 
 37
 2. The Meaning of "Duly Served."
 
 
 38
 Section 401(b) authorizes a district court to issue a writ of injunction only upon a finding that the underlying FCC order was "duly served." It is undisputed that service was accomplished below both by mail and by publication in the Federal Register. Moreover, the Louisiana Commission concedes that it had actual notice of the FCC Preemption Order. The Louisiana Commission, nevertheless, asserts on appeal that the order was not "duly served" within the meaning of the Act because the Louisiana Commission was not personally served with the order. Relying on Milliken v. Meyer, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1940), the Louisiana Commission argues that, in light of the hundreds of mailings the Louisiana Commission receives annually from regulatory agencies, service by mail cannot be considered service reasonably calculated to give actual notice. In addition, the Louisiana Commission contends that it is entitled to personal service because that is the manner of service provided to common carriers under various FCC regulations.
 
 
 39
 We think the Louisiana Commission misconceives the purpose of the "duly served" prerequisite of Sec. 401(b). There is no indication that the requirement of due service was designed to give a person in violation of an FCC order promulgated according to proper procedure a right to additional notice of that order before enforcement proceedings can commence. Rather, we believe the term "duly served" quite plainly refers only to procedural regularity. See Southwestern Bell Tel. Co., supra, at 907. Under this construction, Sec. 401(b), by directing the district court to determine whether "the order was regularly made and duly served," authorizes and requires the district court, although lacking authority to review the substance of an FCC order, to find before issuing an injunction that the order is enforceable as a matter of procedural law. Thus, the requirement of "due service" is met if the defendant in a Sec. 401(b) proceeding received notice legally sufficient to make the order enforceable.
 
 
 40
 Under the APA, a rule is enforceable once it is published in the Federal Register. 5 U.S.C. Sec. 552(a)(1). The Supreme Court has held that appearance of a rule in that publication constitutes legal notice to the general public. See, e.g., Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85, 68 S.Ct. 1, 3-4, 92 L.Ed. 10 (1947). Although we recognize that some agencies may be required to give additional notice to interested parties as a result of the agencies' own rules and regulations, see Gardner v. FCC, 530 F.2d 1086, 1090 (D.C.Cir.1976), FCC regulations clearly require only notice by publication for rulemaking documents. See 47 C.F.R. Sec. 0.445(c).[22] Thus, because the FCC Preemption Order at issue in this case was in fact published in the Federal Register, we hold that the order was duly served within the meaning of the Act and enforceable against the Louisiana Commission.
 
 
 41
 B. Irreparable Injury.
 
 
 42
 Under traditional principles of equity, a court can usually issue a preliminary injunction only upon a finding of irreparable injury. See, e.g., Canal Authority v. Callaway, 489 F.2d 567, 572-73 (5th Cir.1974). The Louisiana Commission argues that the equitable requirement of irreparable injury also applies to Sec. 401(b) proceedings and that the district court erred in not requiring South Central Bell to make such a showing. It is well-established, however, that, when, as is the case here, an injunction is expressly authorized by statute and the statutory conditions are satisfied, the usual prerequisite of irreparable injury need not be established. See, e.g., Gresham v. Windrush Partners, 730 F.2d 1417, 1423 (11th Cir.1984); Trailer Train Co. v. State Board of Equalization, 697 F.2d 860, 869 (9th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983); Atchison, Topeka and Santa Fe Ry. v. Lennen, 640 F.2d 255, 259 (10th Cir.1981); Murry v. American Standard, Inc., 488 F.2d 529, 531 & n. 2 (5th Cir.1973); United States v. Hayes International Corp., 415 F.2d 1038, 1045 (5th Cir.1969); cf. Hecht v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944) (court's discretion under statute expressly authorizing injunction "must be exercised in light of the large objectives of the Act"). The Seventh and Eighth Circuits have already applied this general rule to private parties seeking to enforce under Sec. 401(b) FCC rulemaking orders. See Illinois Bell Tel. Co. v. Illinois Comm'n, 740 F.2d 566, 571 (7th Cir.1984); Southwestern Bell Tel. Co. v. Arkansas Public Service Comm'n, supra, at 908 n. 15. Accordingly, we hold that the district court did not err in issuing the preliminary injunction absent a finding of irreparable injury.[23]
 
 
 43
 C. The Modified Injunction.
 
 
 44
 As discussed above, the district court issued its modified preliminary injunction upon a finding that the Louisiana Commission had violated the court's original injunction ordering the Louisiana Commission to reset intrastate rates using FCC-prescribed depreciation methodologies and rates. The court found that the Louisiana Commission, in reducing South Central Bell's fair rate of return from 13.5% to 12%, had acted arbitrarily and capriciously and with the sole purpose of covering South Central Bell's increased expenses without having to order a corresponding increase in rates. The district court therefore ordered the Louisiana Commission to increase rates sufficiently to allow South Central Bell to recover its additional operating expenses in full. On appeal, the Louisiana Commission argues that it complied with the original injunction and that it reasonably adjusted the fair rate of return downward to take into account the lower investment risks that would result from compliance with the FCC Preemption Order. In addition, the Louisiana Commission asserts that the dollar-specific terms of the modified injunction constitute an unwarranted intrusion into the Louisiana Commission's responsibility to regulate intrastate rates and is prohibited by Sec. 152 of the Communications Act.
 
 
 45
 1. The Finding of Non-compliance.
 
 
 46
 In holding that the Louisiana Commission had violated the injunction, and thus the Preemption Order, by reducing the rate of return merely to minimize telephone rates, the district court necessarily had to make two determinations: (1) that neither the injunction nor the Preemption Order allowed the Louisiana Commission to avoid setting increased rates by simply lowering the rate of return and (2) that the Louisiana Commission did in fact reduce the rate of return other than for a valid reason. We are therefore called upon here not only to review a finding of fact, but also to interpret an FCC order whose substantive validity is beyond our judicial scrutiny.
 
 
 47
 The district court determined below that under the Preemption Order, "unless there are reasonable and proper adjustments to be made, [the] increase in operating costs mandates an equivalent increase in revenues." 570 F.Supp. at 237. The district court thus held that the Preemption Order, although explicitly only preempting the use of inconsistent state depreciation practices, also barred the states from avoiding the consequences of the Preemption Order by manipulating other independent variables used in computing intrastate rates, such as the rate of return.[24] Although we recognize that under this construction the Preemption Order comes perilously close to undermining completely state authority and discretion to set intrastate rates,[25] we find that, in light of the order's regulatory purpose, we must accept the district court's interpretation.
 
 
 48
 In the Preemption Order, the FCC stated that preemption is necessary in order to furnish the telephone industry with more timely capital recovery. According to the FCC, greater capital recovery is needed under the competitive conditions that exist today in order to encourage the modernization of facilities and the investment of capital. The FCC stated:
 
 
 49
 Approximately 75 percent of exchange plant is allocated to the intrastate jurisdiction. It is clear that unless telephone plant, including that portion subject to allocation to the intrastate jurisdiction, is depreciated at a reasonable rate, improperly timed capital recovery will occur. Indeed, in an increasingly competitive environment, it is possible that improper capital recovery could delay or prevent modernization which would add to the costs borne by ratepayers and could, ultimately, threaten carriers' ability to fully recover their invested capital. Moreover, the extent of state action attempting to prevent carriers from utilizing our depreciation prescriptions places substantial burdens on carriers and could well impair their ability to raise the investment capital they will need to fully compete in the continually evolving competitive telecommunications marketplace. Such a result could undermine the achievement of the Commission's objective to develop policies that will engender a dynamic, efficient telecommunications marketplace with services being provided at reasonable prices.
 
 
 50
 92 F.C.C.2d at 877. This purpose would plainly be severely frustrated if state regulatory commissions could offset increased expenses by reducing the rate of return without any regard for the companies' needs to compensate investors and to attract new capital.[26] Thus, because we think it is clear that the Preemption Order in prohibiting inconsistent state depreciation practices was intended also to preclude state responses designed to evade the consequences and the purposes of that preemption, we uphold the district court's first determination.
 
 
 51
 In disputing the district court's second determination, that the rate of return was reduced merely to avoid high telephone rates, the Louisiana Commission challenges a finding of fact. Thus, we apply the "clearly erroneous" standard of review as articulated in Federal Rule of Procedure 52(a). See Gearhart Industries, Inc. v. Smith International, Inc., 741 F.2d 707, 710 (5th Cir.1984); Apple Barrel Productions, Inc. v. Beard, 730 F.2d 384, 386 (5th Cir.1984). The district court's conclusion that the Louisiana Commission had lowered the rate of return without justification relied largely on the Louisiana Commission's May 19, 1983 order denying a rate increase. As partial justification for that denial, the Louisiana Commission stated: "Since the Company has earned a rate of return comparable to that found to be reasonable by the Commission in [1981], we find no justification for an increase in rates at this time." According to the district court, this statement constituted "very clearly a reiteration in 1983 that the rate of return established in 1981 is still in effect." 570 F.Supp. at 237. The district court further found no indication that, between the denial on May 19 and the July 7 order reducing the rate of return, conditions or information available to the Louisiana Commission had changed sufficiently to warrant the downward adjustment. In fact, the district court found that the Louisiana Commission had received no additional evidence during that time. Although on appeal the Louisiana Commission contends that the application of FCC-prescribed depreciation practices is itself sufficient justification for the reduction in the rate of return because of associated lower investor risk, we note that this explanation was never presented to the district court and that it was presented to us for the first time in the Louisiana Commission's reply brief. Based on these considerations, we hold that the district court's finding was not clearly erroneous[27] and that the Louisiana Commission was in fact in violation of the injunction.
 
 
 52
 2. The Power of the District Court.
 
 
 53
 The Louisiana Commission asserts two possible grounds for its contention that the modified injunction was beyond the power of the district court because it was dollar-specific. First, the Louisiana Commission contends that, by requiring a specific increase in rates, the district court violated Sec. 152(b) of the Communications Act which prohibits both the FCC and the district court from setting intrastate rates. The district court justified its dollar-specific injunction on the ground that it relied entirely on the Louisiana Commission's own calculations of the impact the FCC-prescribed depreciation practices would have on South Central Bell's expense level. Thus, reasoned the district court, it did not "set rates."
 
 
 54
 We reject this contention of the Louisiana Commission, but not for the reasons stated by the district court. Section 152(b) states that "nothing in this chapter shall be construed to give [the FCC] jurisdiction with respect to ... charges ... for or in connection with intrastate communication." Section 401(b) generally gives the district court authority to enjoin violations of FCC orders. Neither section imposes restrictions on the court's authority to enforce an FCC order; rather, it is clear that under the Act the extent of the court's power to enjoin is commensurate with the reach of the underlying order. That being the case, we cannot determine whether the district court exceeded its authority under the Act in issuing the dollar-specific injunction without also establishing whether the Preemption Order being enforced was an ultra vires act of the FCC. Therefore, because we must assume the substantive validity of an FCC order in an appeal from a Sec. 401(b) enforcement proceeding, we must also refrain, as long as the injunction was necessary to the enforcement of the FCC order, from inquiring whether the district court's enforcement action was per se beyond its authority under the Act.
 
 
 55
 The second ground asserted by the Louisiana Commission in support of its attack on the specific terms of the injunction is that, by ordering an increase in rates in the amount of $40,506,000, the district court exceeded the mandates of the Preemption Order. This argument is without merit. We have already concluded that the Louisiana Commission violated the Preemption Order by manipulating the rate of return for the sole purpose of avoiding high telephone rates. Thus, we have no trouble finding that the injunction requiring a raise in the rates equal to the increase in expenses is sufficiently tailored to the dictates of the Preemption Order. We note, however, that the Preemption Order only prohibits those changes in the rate of return made merely to avoid the effect of FCC-prescribed depreciation practices. The modified injunction, therefore, will not in the future bar the Louisiana Commission from adjusting the rate of return as long as the determination to do so is made in good faith.
 
 
 56
 D. Comity.
 
 
 57
 The Louisiana Commission finally contends that, even if the district court acted within its statutory and equitable authority in issuing the modified preliminary injunction, the principle of comity requires abstention because the matters before the district court were predominantly local in nature.[28] The Louisiana Commission relies on Alabama Public Service Comm'n v. Southern Ry. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), in which the Supreme Court held that a district court should abstain from intervening in state regulatory matters that are largely of local concern and fall within the special expertise of state administrative agencies or reviewing courts. See also Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); Gulf Water Benefaction Co. v. Public Utility Comm'n, 674 F.2d 462 (5th Cir.1982).
 
 
 58
 We find that this case is not an appropriate one for abstention. Unlike Alabama Public Service Comm'n and Burford, this case concerns issues in no way dependent on local factors or local expertise for their resolution. Rather, the claim presented here is predicated upon a naked exercise of the federal preemption power. Under these circumstances, it is well-established that "the basic premise of preemption--avoiding needless federal court intervention into important matters within the state's jurisdiction to regulate--obviously is lacking." Aluminum Co. of America v. Utilities Comm'n, 713 F.2d 1024, 1030 (4th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984). See also Baggett v. Department of Professional Regulation, 717 F.2d 521, 524 (11th Cir.1983) ("When, because of preemption, a particular state proceeding is beyond its regulatory authority, the need for protection of the state's comprehensive regulatory scheme ... lends no support for abstention ...."); International Brotherhood of Electrical Workers v. Public Service Comm'n, 614 F.2d 206, 212 n. 1 (9th Cir.1980) ("If a preemption claim is well-founded ... Burford abstention cannot be appropriate.). Accordingly, we hold that the district court properly exercised jurisdiction in the instant case.
 
 
 59
 III. CONCLUSION.
 
 
 60
 For the foregoing reasons, we hold that the district court properly issued the preliminary injunction.
 
 
 61
 AFFIRMED.
 
 
 
 [1]
 For a more comprehensive discussion of agency ratemaking and associated problems, see generally J. Bonbright, Principles of Public Utility Rates (1961); Foster, Fair Return Criteria and Estimation, 28 Baylor L.Rev. 883 (1976); Schwartz, Inflation and Utility Rate Regulation, 4 Utah L.Rev. 89 (1982). For a description of ratemaking in Louisiana, see South Central Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n, 373 So.2d 478 (La.1979); Defendant's Exhibit 1, at 1-9
 
 
 [2]
 47 U.S.C. Sec. 220(a)-(b). Section 220(b) provides:
 (b) The Commission shall, as soon as practicable, prescribe for such carriers the classes of property for which depreciation charges may be properly included under operating expenses, and the percentages of depreciation which shall be charged with respect to each of such classes of property, classifying the carriers as it may deem proper for this purpose. The Commission may, when it deems necessary, modify the classes and percentages so prescribed. Such carriers shall not, after the Commission has prescribed the classes of property for which depreciation charges may be included, charge to operating expenses any depreciation charges on classes of property other than those prescribed by the Commission, or, after the Commission has prescribed percentages of depreciation, charge with respect to any class of property a percentage of depreciation other than that prescribed therefor by the Commission. No such carrier shall in any case include in any form under its operating or other expenses any depreciation or other charge or expenditure included elsewhere as a depreciation charge or otherwise under its operating or other expenses.
 
 
 [3]
 Several provisions of the Act preclude the FCC from exercising jurisdiction over intrastate communications. Section 152(b) provides that "nothing in this chapter shall be construed ... to give the [FCC] jurisdiction with respect to ... charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication." See also 47 U.S.C. Sec. 221(b)
 
 
 [4]
 The "remaining-life" method of depreciation replaced the "whole-life" method. Although both are used in connection with straight-line depreciation, remaining life more accurately reflects the current experienced life of an asset. The FCC explained:
 The essential difference between whole-life and remaining-life depreciation rate calculations is that the former attempts to determine that annual charge that would be appropriate in the event that the current predictions of whole-life (estimated future life added to current experienced or expired life) were in fact correct. The remaining-life process proceeds on the premise that the current prediction of remaining or prospective life is correct and attempts to allocate any unrecovered or unallocated costs over that time period. That is, the original cost less accumulated reserve, or net unrecovered cost is divided by the prospective remaining-life in order to determine the annual future charges to expense.
 
 
 [83]
 F.C.C.2d at 289. The SLELG procedure replaced the straight-line vintage group (SLVG) method. The essential difference between these two is that SLELG breaks equipment down into smaller subgroups in calculating useful life. Under SLELG, therefore, estimates of useful life are in the aggregate more accurate
 
 
 [5]
 The FCC further stated:
 All accounting measures are important, but in the case of capital intensive industries the measure of depreciation becomes even more important. On the whole such industries are frequently regulated and annual revenue requirements reflect both the current measure of the consumption of capital (depreciation) and a provision for the costs (return requirement) of the capital still unrecovered through depreciation charges. If depreciation policies or practices were to be determined solely with concern for the level of revenue requirements, the actual measure of depreciation might be misstated. Such distortion of the measure of depreciation would in turn lead to a misstatement of the results of operations for the period and would also misstate the relative position of the enterprise as shown by its balance sheet. If such distortions were perceived by present and potential investors and were deemed to be deleterious to the safety and recovery of their investment, they in turn would likely demand a higher return on their funds. Consequently, a failure to properly measure by understating these costs would, in the long run, probably be offset by higher costs of capital without any real avoidance of the ultimate need to provide full recovery for the capital.
 
 
 [83]
 F.C.C.2d at 271-72
 
 
 [6]
 The FCC in addition stated:
 We have always given special consideration to the needs and views of state commissions in developing accounting and depreciation rules and most State commissions have chosen to follow most accounting and depreciation rules prescribed by this Commission. Departures have nonetheless occurred from time to time.
 This Commission has never attempted to prevent any State commission from departing from our accounting and depreciation rules. Indeed we have expressly recognized that State commissions have a right to do so.
 
 
 [89]
 F.C.C.2d at 1106-07
 
 
 [7]
 The FCC rejected the argument that 47 U.S.C. Sec. 152(b), see supra note 2, prohibits the FCC from preempting state depreciation practices. The FCC stated:
 Section 220(b) only prohibits the states from setting depreciation rates for telephone property inconsistent from those prescribed by the FCC. It does not require that any particular tariff for intrastate service be accepted by the state commissions. The setting of depreciation rates and classes of depreciable property only resolves a single issue impacting the ratemaking process. It does not restrict the state commission's broad discretion in setting charges for individual services.
 
 
 [92]
 F.C.C.2d at 874
 
 
 [8]
 On the same day the Preemption Order was adopted, the FCC issued a ruling in Docket No. 82-576 that prescribed specific SLELG rates to be used in calculating depreciation for South Central Bell equipment. This order, released a few days before the Preemption Order, also declared FCC-prescribed depreciation methods binding on the states. If the Louisiana Commission had used these specific rates, the revenue requirements of South Central Bell would certainly have increased
 
 
 [9]
 In its order, the Louisiana Commission stated:
 As noted, the Commission denied the rate request of South Central Bell in May, but did not make a determination of the fair rate of return on equity. The currently authorized overall rate of return of South Central Bell was set in 1981, when market interest rates were significantly higher than they are today. The prime rate has remained at about 10 1/2 per cent for some time. In addition, the rate of return earned by the Company includes a return on unamortized investment tax credits, which constitute approximately 7.5 per cent of South Central Bell's total capital. In fact, however, these tax credits are cost-free investment of the Company, so in reality the rate of return on its investor-supplied equity is higher than that authorized for regulatory purposes. When these factors are viewed in light of the continued low level of inflation, and continued high unemployment, we find that a rate of return of equity of 12 per cent is sufficient to assure confidence in the Company's financial soundness, will be adequate to maintain and support its credit and will permit it to raise the capital necessary to perform its public functions. The gross revenue increase necessary to produce a rate of return on equity of 12 per cent after taking account of the ratemaking adjustments proposed by a consultant of the Commission, Bruce M. Louiselle, and recognizing the full amount of the FCC-mandated accounting changes as quantified by South Central Bell, is $12,700,000.
 Record at 203.
 
 
 [10]
 Section 2342 provides that "[t]he court of appeals ... has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of ... all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." Section 402(a) provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter ... shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28."
 
 
 [11]
 We point out nonetheless that the Fourth Circuit in a Sec. 402(a) proceeding has recently upheld the validity of the Preemption Order. Virginia State Corp. Comm'n v. FCC, 737 F.2d 388 (4th Cir.1984). The Louisiana Commission was an intervenor in those proceedings
 
 
 [12]
 The Louisiana Commission also argues that it is not in disobedience of the Preemption Order or the original injunction. We address this argument in subpart C
 
 
 [13]
 The FCC received comments from the Arkansas Public Service Commission, the Public Utilities Commission of Ohio, the Public Utilities Commission of the State of California, the Virginia State Corporation Commission, NARUC, the United States Independent Telephone Association, the Ohio Office of Consumers' Counsel, the United Telephone System, Inc., and the Idaho Public Utilities Commission, Inc
 
 
 [14]
 The FCC also stated:
 In the past the communications marketplace was typified by monopoly conditions and life and salvage factors underlying the state rates were generally very similar, if not identical, to those used by the Commission. In that environment it was not essential that the Commission assert all the authority granted it. See Computer and Communications Industry Association v. FCC, [693 F.2d 198 (D.C.Cir.1982) ]. As discussed, infra, in the more competitive conditions prevailing today, the utilization of proper methods and rates is more critical if the proper incentives are to be created to insure that the marketplace will function efficiently to bring the benefits of that competition to the ratepayers of this country. Therefore, where it is necessary to protect important federal policies against frustration by inconsistent state actions, we will exercise the full breadth of our depreciation powers.
 
 
 [92]
 F.C.C.2d at 874
 
 
 [15]
 In so holding, we join the First, Fourth and Eighth Circuits which have also regarded the Preemption Order as a rule of substantive law. See New England Tel. & Tel. Co. v. Public Utilities Comm'n, 742 F.2d 1, 4 (1st Cir.1984); Virginia State Corp. Comm'n, supra, at 393-94; Southwestern Bell Tel. Co., supra, at 904
 
 
 [16]
 The First Circuit also relied on the definition of the word "order" in the Administrative Procedure Act (APA), 5 U.S.C. Sec. 551(6), as at least furnishing a starting point from which to begin the inquiry. As the First Circuit acknowledged, however, the Communications Act was enacted more than ten years before the APA, and the APA itself only makes its terminology mandatory in APA contexts. See 5 U.S.C. Sec. 551. In non-APA contexts administrative terminology is still used inconsistently among administrative agencies. See B. Schwartz, Administrative Law Sec. 4.1 (2d ed. 1984) (the Treasury continues to call its general rules "decisions" and the FCC continues to call its regulations "orders")
 
 
 [17]
 Although the First Circuit cites Kroeger v. Stahl, 148 F.Supp. 403, 406 (D.N.J.), aff'd, 248 F.2d 121 (3d Cir.1957), in support of the contention that "order" in Sec. 401(b) should be given the same meaning that it has under the APA, we note that Kroeger involved not a rule but a "special temporary authorization" that was held not to be a "final disposition."
 
 
 [18]
 Section 401(a) provides as follows:
 (a) The district courts of the United States shall have jurisdiction, upon application of the Attorney General of the United States at the request of the Commission, alleging a failure to comply with or a violation of any of the provisions of this chapter by any person, to issue a writ or writs of mandamus commanding such person to comply with the provisions of this chapter.
 In denying a petition for rehearing, the First Circuit in New England Tel. & Tel. Co. distinguishes Ambassador, Inc. on the ground that the action in that case might have been brought pursuant to Sec. 401(a). The First Circuit relies on the statement made by the Supreme Court that "a departure from the [tariff] regulation is forbidden by the Act." 325 U.S. at 325, 65 S.Ct. at 1155. Violating rules and regulations of the FCC though is just as violative of the Act as is disobeying tariff regulations. See 47 U.S.C. Sec. 416(c). Under the First Circuit's reasoning, therefore, any regulatory violation would authorize a Sec. 401(a) injunction. We think it is clear, however, in light of the existence of Sec. 401(b), that the scope of a district court's authority under Sec. 401(a) is limited to enjoining violations of specific provisions of the Act and not rulemaking orders or tariff regulations.
 
 
 [19]
 See supra note 10
 
 
 [20]
 Further support comes from cases involving Sec. 16(12) of the Interstate Commerce Act, 49 U.S.C. Sec. 16(12) (repealed). The legislative history of Sec. 401(b) indicates that Congress took the text of Sec. 401(b) almost word for word from Sec. 16(12). See S.Rep. No. 781, 73d Cong., 2d Sess. 9 (1934). Although some courts have held that under Sec. 16(12) only orders that specifically command certain individuals to take particular actions may be enforced, see, e.g., Farmers' Loan & Trust Co. v. Northern Pac. Ry., 83 F. 249 (D.Wash.1897), other courts, including the Fifth Circuit, have enforced rules and regulations under the statutory provision. See Pacific Fruit Express Co. v. Akron, Canton, & Youngstown R.R., 524 F.2d 1025, 1031 (9th Cir.1975), cert. denied, 424 U.S. 911, 96 S.Ct. 1107, 47 L.Ed.2d 315 (1976); United States v. City of Jackson, 318 F.2d 1, 9 (5th Cir.1963)
 
 
 [21]
 The Louisiana Commission also argues in its reply brief that South Central Bell is not a "party injured" by the Louisiana Commission's noncompliance with the Preemption Order. We find this argument to be without merit. The FCC reconsidered the preemptive effect of its depreciation policies in response to a petition filed by AT & T on behalf of itself and the associated Bell System Operating Companies, including South Central Bell. 92 F.C.C.2d at 865. But see South Central Bell Tel. Co. v. Louisiana Public Serv. Comm'n, 412 So.2d 1069, 1075 n. 8 (La.1982), (South Central Bell held not to be a party in Computer II decision for purpose of La.Rev.Stat.Ann. Sec. 45:1180). Moreover, the same policy considerations that persuaded us to adopt a broad reading of "order" equally persuades us to adopt a broad reading of "parties." Finally, we note that courts that have allowed private parties to enforce rules and regulations of the Interstate Commerce Commission under Sec. 401(b)'s sister provision, 49 U.S.C. Sec. 16(12), have regarded as a party any person injured who was a member of the benefited class. See Carothers v. Western Trans. Co., 554 F.2d 799, 805 (7th Cir.1977); Pacific Fruit Express Co. v. Akron, Canton, & Youngstown R.R., 355 F.Supp. 700, 709 (N.D.Cal.1973), aff'd, 524 F.2d 1025 (9th Cir.1975), cert. denied, 424 U.S. 911, 96 S.Ct. 1107, 47 L.Ed.2d 315 (1976). Cf. Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 72, 91 S.Ct. 203, 210, 27 L.Ed.2d 203 (1970)
 
 
 [22]
 We note further that under 47 C.F.R. Sec. 0.445(a), FCC opinions and "orders" require only service by mail. Thus, even if "order" were given the same meaning in FCC regulations that the word has in the context of Sec. 401(b), the Preemption Order would have been "duly served." Although one provision of the Act, Sec. 416(a), requires personal service of FCC orders, that provision by its own terms applies only to carriers
 
 
 [23]
 Cases cited by the Louisiana Commission in support of the need to find irreparable injury are distinguishable in that they involve implied causes of action. See, e.g., Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 63-64, 95 S.Ct. 2069, 2078-79, 45 L.Ed.2d 12 (1975) (plaintiff in asserting cause of action not authorized expressly by statute or its legislative history is not relieved of the burden of the traditional prerequisites of relief)
 
 
 [24]
 By "independent" we do not mean to say that the depreciation practices used by a utility have absolutely no effect on the fair rate of return. As the depreciation rate is accelerated, capital recovery is quicker and, as a consequence, the risks to investors may well be reduced. The rate of return, however, is independent in the sense that a regulatory agency in setting the rate of return must take into account factors other than its effect on the costs of services. See J. Bonbright, supra note 1, at 148-58
 
 
 [25]
 In his dissenting opinion in Virginia State Corp. Comm'n v. FCC, supra, at 398, Judge Widener predicted: "The logical result of [upholding the Preemption Order] is to permit the FCC to abrogate completely the state regulation of intrastate ratemaking for the carriers' intrastate operations in violation of the Communications Act."
 
 
 [26]
 These criteria are the ones usually considered in computing the rate of return. See, e.g., Federal Power Comm'n v. Hope Natural Gas, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944) ("[The rate of return] should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.")
 
 
 [27]
 While the court apparently did not hold an evidentiary hearing before modifying its injunction, the parties were afforded and took advantage of the opportunity to brief and argue fully their positions to the district court. Moreover, both parties were permitted wide latitude in filing attachments to their briefs and memoranda. See Commerce Park at DFW Freeport v. Mardian Const. Co., 729 F.2d 334, 340 (5th Cir.1984)
 
 
 [28]
 We reject out of hand the Louisiana Commission's claim that the Johnson Act, 28 U.S.C. Sec. 1342, prohibits the district court from issuing the injunction. The Johnson Act is applicable only when "[j]urisdiction is based solely on diversity of citizenship or repugnance of the [state action] to the Federal Constitution." Id., Sec. 1342(1); see also DeKalb County v. Southern Bell Tel. & Tel. Co., 358 F.Supp. 498, 504 (N.D.Ga.1972) (all four preconditions must be present before Johnson Act is applicable), aff'd, 478 F.2d 700 (5th Cir.1973). As the district court noted, South Central Bell here asserts jurisdiction under Sec. 401(b) of the Communications Act, not upon any alleged repugnance of the defendant's action to the Constitution. 570 F.Supp. at 234. See also Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n, 560 F.Supp. 844, 847 (D.Md.1983)