**MIDDLE SOUTH ENERGY, INC., and Arkansas Power and Light Company, Appellees,**

v.

**ARKANSAS PUBLIC SERVICE COMMISSION; Robert E. Johnston, Commissioner; Patricia S. Qualls, Commissioner; and James W. Daniel, Commissioner; Attorney General of Arkansas; and Ratepayers Fight Back, Appellants.**

Nos. 84–2409, 84–2410 and 84–2480.

United States Court of Appeals, Eighth Circuit.

Submitted April 8, 1985.

Decided Aug. 23, 1985.

---

Vincent Foster, Jr., Little Rock, Ark., for appellants.

Jerry D. Jackson and Michael Thompson, Little Rock, Ark., for appellees.

Mary P. Stallcup, Little Rock, Ark., for Attorney General of Ark.

Before ROSS and JOHN R. GIBSON, Circuit Judges, and MEREDITH,* Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

The issues before us involve a judgment of the district court[1] enjoining the Arkansas Public Service Commission from continuing proceedings to determine whether it should declare void *ab initio* certain contracts entered into by Arkansas Power and Light Company with respect to the purchase of power from, or payment for construction of, a nuclear power plant located in Mississippi. The Arkansas Public Service Commission, the Attorney General of Arkansas, and a consumer group called Ratepayers Fight Back argue that the district court erred in finding that the Federal Energy Regulatory Commission has exclusive jurisdiction over the contracts that were the subject of the APSC's proceedings. They further argue that the district court lacked subject matter jurisdiction, that the litigation was not ripe, and that the court abused its discretion by failing to abstain pending the outcome of the state agency proceedings and by granting overbroad relief. We have carefully considered these arguments, and because we believe that the actions threatened by the APSC would burden interstate commerce, we affirm the judgment of the district court.

The Arkansas Power and Light Company, together with the Louisiana Power and Light Company, the Mississippi Power and Light Company, and New Orleans Public Service, Inc., are wholly-owned operating subsidiaries of Middle South Utilities, Inc. The operating companies provide electric service to wholesale and retail consumers in Arkansas, Louisiana, Mississippi, and Missouri, with an aggregate consumer population of approximately five million people. Planning and operation of the electric generation and transmission facilities needed to meet the demands of the MSU system are performed according to systems agreements. "Transmission and generation functions are so coordinated and integrated as to permit an instantaneous transfer of electrical power to any part of Middle South's transmission network." *Arkansas Power & Light Co. v. Federal Power Commission*, 368 F.2d 376, 378 (8th Cir.1966). Because the need was seen in the early 1970's to develop additional power generating facilities, Middle South Energy, Inc., also a wholly-owned MSU subsidiary, was created in 1974 to finance, construct, and operate a two-unit nuclear generating plant to be located in Port Gibson, Mississippi and known as the Grand Gulf Nuclear Elec-

* The HONORABLE JAMES H. MEREDITH, Senior United States District Judge for the Eastern District of Missouri, sitting by designation.

1. The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas.

tric Station.[2] The creation of MSE was necessary because none of the four operating subsidiaries had sufficient resources to finance and construct the nuclear generating plant.

This case involves contracts entered into with respect to the financing and construction of the plant, as well as agreements made concerning the sale of the power to be generated. MSE has financed the three billion dollar cost of the first unit by selling common stock to MSU,[3] borrowing from commercial banks, and issuing first mortgage[4] and pollution control bonds.[5]

In 1974, through a document called the Availability Agreement, MSE obtained from each of the MSU operating companies their commitment to purchase power from the Grand Gulf project. The operating companies agreed to pay MSE, beginning on specified dates, amounts needed for MSE to meet its operating expenses, whether or not the two units of the project were then operating. Payments would be

credited to the cost of their future power purchases from MSE. The Availability Agreement has been essential to the financing of the project.[6] Pursuant to a series of ten agreements entered into between 1977 and 1984, MSE has assigned its rights under the Availability Agreement to secure indebtedness in excess of $2.5 billion.[7]

The Availability Agreement initially provided that the share of Grand Gulf power taken by the operating companies would vary relative to their respective needs. In June 1981, the Availability Agreement was amended[8] to fix the allocations of power in these percentages:[9] AP & L—17.1%; LP & L—26.9%; MP & L—31.3%; NOPSI—24.7%.

On July 28, 1981, MSE and the operating companies entered into a Reallocation Agreement, under which the operating companies agreed to purchase power in the following percentages: AP & L—0%; LP &

**2.** Grand Gulf Unit No. 1 was scheduled to commence commercial operation on July 1, 1985, while the construction of Grand Gulf Unit No. 2 has been suspended.

**3.** MSU is registered under and subject to Securities and Exchange Commission authority by the Public Utility Holding Company Act of 1935. 15 U.S.C. §§ 79 to 79z–6 (1982). These stock sales received SEC approval. Middle South Utilities, SEC Public Utility Holding Co. Act Rel. No. 23,579 (Jan. 23, 1985). In opposing approval of the most recent stock sale, APSC urged that the SEC withhold authorization until AP & L could show compliance with Arkansas law. The SEC rejected this argument, but assured the APSC that the federal securities authorization did not "supersede requirements of state laws as they may eventually be established in respect to AP & L's commitments in the financing of the Grand Gulf project." Id. at 7.

**4.** This transaction was approved by the SEC. Middle South Energy, SEC Public Utility Holding Co. Act Rel. No. 23,526 (Dec. 12, 1984).

**5.** This transaction was approved by the SEC. Middle South Energy, SEC Public Utility Holding Co. Act Rel. No. 23,495 (Nov. Energy, SEC Public Utility Holding Co. Act Rel. No. 23,495 (Nov. 23, 1984). APSC urged the SEC to withhold approval on the grounds that AP & L had not complied with state law. The SEC declined, but noted that the SEC "does not resolve disputed issues of state law and the order in this

case does not prejudice the Arkansas Commission, which may assert its jurisdiction under whatever procedures the state laws permit." Id. at 2 (footnote omitted).

**6.** The financing aspects of the original Availability Agreement were approved by the SEC. Middle South Utilities, SEC Public Utility Holding Co. Act Rel. No. 18,437 (June 4, 1974). APSC did not intervene in this proceeding. Its attacks on the agreement in collateral proceedings before the SEC have been rejected. See supra notes 3 & 5.

**7.** A number of agreements were executed in which the operating companies agreed that in case of default by MSE they would make payments due under the Availability Agreement directly to the banks. In return, the lenders agreed that, should some regulatory agency prohibit the operating companies from making payments under the Availability Agreement, the lenders would make unsecured advances to MSE equal to the amounts it would have received under the Availability Agreement.

**8.** The amendment was approved by the SEC. Middle South Energy, Public Utilities Holding Co. Act Rel. No. 22,098 (June 22, 1981).

**9.** South Mississippi Electric Power Association, which is not a subsidiary of MSU, owns 10% of the Grand Gulf project. The allocation figures pertain to the 90% share owned by MSE.

L—38.57%; MP & L—31.63%; NOPSI—29.80%.[10] In June 1982, MSE and the operating companies entered into an agreement, the Unit Power Sales Agreement, which required each operating company to purchase the shares of power specified in the Reallocation Agreement. AP & L signed the UPSA but, in accordance with the terms of the Reallocation Agreement, did not agree to purchase any power from the project. The UPSA was filed with the Federal Energy Regulatory Commission for approval as a wholesale power sales agreement.

In February 1984, a FERC administrative law judge rejected the allocation in the UPSA and obligated the operating companies to purchase power from Unit No. 1 as follows: AP & L—36%; LP & L—14%; MP & L—33%; NOPSI—17%. The ALJ reasoned that:

[T]he evidence of Middle South's witnesses is overwhelming that the Middle South system is a single integrated and coordinated electric system operating in Louisiana, Mississippi, Arkansas and Missouri. Planning, construction, and operations are conducted for the system as a whole. Loads on the system are met by centrally dispatching the most economical mix of generators wherever located in the system. Middle South Utilities, Inc. owns the stock of the operating utilities as well as the stock of MSS and MSE. When difficult system decisions have to be made, such as deciding the allocation of Grand Gulf, it is the Board of Directors of Middle South Utilities, Inc., that ultimately makes the decision, not an individual subsidiary company or a group of subsidiaries.

The Grand Gulf project was initiated in the 1970's to meet the then projected demand on the Middle South system by the end of that decade and not just the load of any Middle South operating company or companies. Constructing generation to meet system load was true of every unit constructed on the Middle South system.

Under these circumstances the costs of Grand Gulf capacity and energy should be shared equitably by MSU's operating companies and their customers.

*Middle South Energy,* 26 F.E.R.C. ¶ 63,044, at 65,106 (1984), *aff'd,* 31 F.E.R.C. ¶ 61,305 (1985). The APSC had actively intervened in the proceedings before FERC. It had contended that FERC had no jurisdiction to obligate AP & L to take a share of Grand Gulf and that Arkansas neither wanted or needed the relatively high-cost power from the project. These arguments were rejected.

Approximately one month later, the APSC issued two orders instituting formal inquiries into AP & L's role in the Grand Gulf project. Predicting that Grand Gulf would result in "dramatic [rate] increases" which would place an "intolerable burden" on AP & L's customers and have a "crippling effect" on the Arkansas economy, *Arkansas Power & Light Co.,* Ark.Pub. Serv.Comm'n Docket No. 84–041–0II, at 1 (Mar. 12, 1984), the APSC ultimately sought to "protect the interests of the residential, business, and industrial customers of AP & L and preserve the viability of the economy of the State of Arkansas." *Arkansas Power & Light Co.,* Ark.Pub.Serv. Comm'n Docket No. 84–040–0II, at 2 (Mar. 12, 1984).

On August 1, 1984, the APSC ordered AP & L to appear and "show cause why all contracts and agreements made by it with respect to any obligations to purchase power from or to pay for construction and operation costs of the Grand Gulf Project should not be held to be void *ab initio* as a matter of law." *Arkansas Power & Light Co.,* Ark.Pub.Serv.Comm'n Docket No. 84–190–U, at 6 (Aug. 1, 1984). The APSC had already concluded that thirty-six such agreements constituted prima facie violations of Arkansas law requiring APSC approval of certain transactions by public util-

10. This agreement was approved by the SEC. Middle South Energy, Public Utility Holding Co.

Act Rel. No. 22,280 (Nov. 18, 1981).

ities. *Id.; see* Ark.Stat.Ann. § 73–253(a)(3) (1979 Repl.) (utility must have APSC approval to "sell, acquire, lease or rent any public utility plant or property constituting an operating unit or system"); *id.* § 73–255 (Supp.1983) (utility must have APSC approval to "issue stocks, bonds, notes or other evidence of indebtedness payable at periods of more than thirty-six (36) months"). After AP & L's motion to dismiss the show cause order for lack of jurisdiction was denied, MSE filed suit in the district court to temporarily and permanently enjoin the proceedings before the APSC. AP & L intervened as a plaintiff, while the Arkansas Attorney General and Ratepayers Fight Back intervened as defendants. A hearing was held on the consolidated issues of preliminary and permanent relief. The district court found that the APSC's actions were preempted by the Federal Power Act, 16 U.S.C. §§ 824–824k (1982), and permanently enjoined APSC from conducting further proceedings on the show cause order. Regarding the need for equitable relief, the court found:

> MSE must raise an additional several billion dollars in the next few years to pay construction and financing costs. The ability to raise these funds is dependent on the enforceability of the threatened agreements. If the actions of the APSC are not enjoined, the cost of capital to MSE will be raised to the point that the Project is jeopardized, and the ability of MSE to provide its multi-state wholesale customers with power will be irreparably impaired.

*Middle South Energy, Inc. v. Arkansas Public Service Commission,* 593 F.Supp. 363, 366 (E.D.Ark.1984).[11]

11. The SEC noted recently that delaying commercial operation of the reactor would increase costs by about $28 million per month, primarily in finance charges. Middle South Utilities, Public Utility Holding Co. Act Rel. No. 23,579 at 9 (Jan. 23, 1985).

12. Arkansas Electric Energy Consumers and Reynolds Metals Company filed an amicus curiae brief, as did the Metropolitan Life Insurance Company and other holders of MSE's first mortgage bonds.

The APSC, the Arkansas Attorney General, and Ratepayers filed an appeal with this court.[12] After the case was argued, FERC affirmed the order of the ALJ allocating AP & L 36% of the Grand Gulf capacity. *Middle South Energy,* 31 F.E. R.C. ¶ 61,305 (1985).

## I.

As an initial matter, amicus curiae on behalf of the APSC[13] asserts that MSE's suit does not "aris[e] under the Constitution [or] laws * * * of the United States" as required to invoke federal question jurisdiction under 28 U.S.C. § 1331 (1982) because, pursuant to the "well-pleaded complaint" rule, the federal question must be raised necessarily as an element of the plaintiff's entitlement to relief and cannot merely be a response to an anticipated defense. *See generally Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 7–12, 103 S.Ct. 2841, 2845–2848, 77 L.Ed.2d 420 (1983) (citing older cases). Specifically, amicus curiae argues that jurisdiction is lacking because MSE's preemption claim is merely a defense to the state administrative action. *See id.* at 15–16, 103 S.Ct. at 2849–2850 (discussing *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950)). This argument ignores the recognition by the Supreme Court that "a claim of federal preemption does not always arise as a defense to a coercive action." *Franchise Tax,* 463 U.S. at 12 n. 12, 103 S.Ct. at 2848 n. 12; *see Aluminum Co. of America v. Utilities Commission,* 713 F.2d 1024, 1028 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984). The "not a defense to a state action" rule is premised on the

13. We consider this issue, though not raised by a party, since subject matter jurisdiction cannot be waived or conferred by consent. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed. 492 (1982); *United States ex rel. Burnette v. Driving Hawk,* 587 F.2d 23, 24 (8th Cir.1978).

determination that the declaratory judgment act, 28 U.S.C. § 2201 (1982), is merely procedural and that Congress thereby did not enlarge the subject matter jurisdiction of federal courts. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950). This concern is not implicated when the declaratory plaintiff has independent grounds for federal relief such as an injunction. Note, *Federal Jurisdiction over Declaratory Suits Challenging State Action*, 79 Colum.L.Rev. 983, 1001 (1979).[14] Thus, the district court had subject matter jurisdiction pursuant to MSE's complaint, which on its face properly raises the federal question of whether the state proceeding should be enjoined on preemption[15]

grounds.[16] *Shaw v. Delta Air Lines*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983).

■ Appellants nevertheless argue that jurisdiction is lacking because there will be no "ripe" case or controversy until the APSC reaches some determination as to the validity of the contracts and the effects of that determination are felt by MSE. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967). This argument again ignores the true nature of the relief sought. MSE challenges not the state's ultimate substantive decision but its authority to even conduct the contemplated proceeding. It can hardly be doubted that a controversy sufficiently concrete for judi-

**14.** To deny access to federal court when, regardless of the existence of procedures for declaratory relief, an injunction would otherwise have been available would contract the jurisdiction of the federal courts. Note, *supra*, at 1001. Cases that appear to have taken this route have generally relied on the Supreme Court decision of *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952), which actually turned on the failure of the plaintiff to establish a ripe controversy or to identify what right it was asking the court to declare. *Id.* at 244–46, 73 S.Ct. at 240–41; *see Franchise Tax*, 463 U.S. at 16 n. 14, 103 S.Ct. at 2850 n. 14. Furthermore, the widely quoted *Wycoff* dictum suggesting that even if the controversy had been ripe, federal subject matter jurisdiction would have been lacking, is again couched solely in terms of declaratory relief, the Court having determined that the plaintiff had abandoned its request for an injunction because of the absence of proof of the threatened injury necessary to support that form of relief. 344 U.S. at 241, 73 S.Ct. at 239. The Supreme Court itself has never interpreted *Wycoff*, as some courts of appeals have, to hold that subject matter jurisdiction does not exist any time a federal claim can be litigated as a state defense. *Illinois v. General Elec. Co.*, 683 F.2d 206, 211 (7th Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *Braniff Int'l v. Florida Pub. Serv. Comm'n*, 576 F.2d 1100, 1104 (5th Cir.1978). Concerns with the timing of adjudication need not distort analysis of subject matter jurisdiction but instead can be—and more appropriately are—handled through the discretion of courts in matters involving equitable relief and through doctrines such as exhaustion of administrative remedies and abstention. Note, *supra*, at 1001.

**15.** It makes no difference to subject matter jurisdiction that we ultimately choose not to decide this case on preemption grounds. Furthermore,

the operation of the commerce clause in limiting state authority is sufficiently similar to preemption that we believe the same jurisdictional analysis applies.

**16.** There are no Eighth Circuit decisions to the contrary. Despite the representations of amicus curiae, three of the cases it cites stand only for the proposition that a preemption claim does not raise a federal question under section 1331 when, *absent the availability of the declaratory judgment procedure*, it would have arisen only as a defense to a state action. Neither the language nor context of these cases extends this interpretation of the well-pleaded complaint rule to foreclose *injunctions* sought on preemption grounds. *E.g., First Fed. Sav. & Loan Ass'n v. Anderson*, 681 F.2d 528 (8th Cir.1982) (declaratory judgment only sought; no pending state proceeding to enjoin); *Lawrence County v. South Dakota*, 668 F.2d 27 (8th Cir.1982) (same); *First Nat'l Bank v. Aberdeen Nat'l Bank*, 627 F.2d 843 (8th Cir.1980) (en banc) (removal to federal court improper when based on ground that preemption would be raised as a defense to state tort action). The one case cited by amicus curiae in which we did find subject matter jurisdiction lacking despite a request for an injunction is distinguishable in that the panel expressly found the preemption claim there to be only in the nature of a defense to the state administrative proceeding. *Home Fed. Sav. & Loan Ass'n v. Insurance Dep't*, 571 F.2d 423, 427 (8th Cir.1978). Since MSE is seeking affirmative relief from the APSC's attempts to even inquire into certain affairs relating to its business, we need not decide if the characterization of the preemption claim in *Home Federal* remains viable in light of *Shaw*.

cial review exists when the proceeding sought to be enjoined is already in progress.

## II.

The district court's decision on preemption grounds was based on the Federal Power Act. Congress's purpose in enacting the Act was to regulate "the transmission of electric energy in interstate commerce and * * * the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b) (1982). To accomplish this goal, Congress gave FERC the power to make "just and reasonable" any public utility "rule, regulation, practice *or contract affecting* [a] rate, charge, or classification [that] is unjust, unreasonable, unduly discriminatory or preferential." *Id.* § 824e(a) (emphasis added).

The district court held that the Availability Agreement and its amendments were "agreements for the purchase of wholesale power in interstate commerce or are so integrally related to such purchases that they are subject to the exclusive jurisdiction of the FERC." At 366. The other agreements subject to the APSC order were found to be "essential to the interstate wholesale sale of power and therefore * * * not subject to state jurisdiction." *Id.* We read the district court's order as finding preemption on the ground that the threatened actions of the APSC would block the accomplishment of the purpose behind the Federal Power Act. *See Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

Essentially, the APSC is trying to secure for Arkansas the zero allocation embodied in the UPSA. Such a result would be contrary to the 36% allocation recently approved by FERC in regulating the wholesale aspects of the Grand Gulf project. Thus, a strong argument can be made that the APSC's powers have been preempted by the Federal Power Act. The appellants, on the other hand, urge that we examine the APSC's powers in light of other federal legislation, the Public Utility Holding Company Act of 1935. This law, they argue,

expressly reserves to the states some jurisdiction to regulate the securities dealings of utility holding companies and their subsidiaries. *See* 15 U.S.C. §§ 79f(b), 79g(g), 79u (1982); *infra* at 414–15; *supra* notes 3 & 5.

The district court's order did not squarely deal with the argument now made by appellants. We are not convinced that the district court improperly based its decision on preemption grounds. Nevertheless, we choose not to address the difficult question of whether the authority denied the states under the Federal Power Act may be granted to them by the Holding Company Act, because the case can be disposed of under well-settled commerce clause principles. *See New England Power Co. v. New Hampshire*, 455 U.S. 331, 344 n. 10, 102 S.Ct. 1096, 1103 n. 10, 71 L.Ed.2d 188 (1982) (deferring resolution of preemption issues in favor of commerce grounds).

## III.

█ The commerce clause grants Congress the power to regulate commerce among the states. U.S. Const., art. I, § 8, cl. 3. It has long been recognized as implying limits on the powers of the states to erect barriers against interstate trade. *South-Central Timber Development v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984); *see Cooley v. Board of Wardens* 53 U.S. (12 How.) 299, 317–18, 13 L.Ed. 996 (1852). Absent conflicting federal legislation, the states may exercise police power over matters of legitimate local concern even though such regulation may affect interstate commerce. *Philadelphia v. New Jersey*, 437 U.S. 617, 623–24, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978); *Raymond Motor Transportation v. Rice*, 434 U.S. 429, 440, 98 S.Ct. 787, 793, 54 L.Ed.2d 664 (1978). Incidental burdens on interstate commerce may be unavoidable when a state legislates to protect its citizens. *Philadelphia v. New Jersey*, 437 U.S. at 623–24, 98 S.Ct. at 2535. Nevertheless, the safeguarding of local interests must ultimately yield to the principle that "one state in its dealings may not place

itself in a position of economic isolation." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 527, 55 S.Ct. 497, 502, 79 L.Ed. 1032 (1935).

"[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the states." *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission*, 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983). "Need for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States." *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission*, 461 U.S. 190, 205, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1983); *see also Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 569, 100 S.Ct. 2343, 2353, 65 L.Ed.2d 341 (1980) ("The state's concern that rates be fair and efficient represents a clear and substantial governmental interest."). At the same time, however, the "production and transmission of energy is an activity particularly likely to affect more than one state, and its effect on interstate commerce is often significant enough that uncontrolled regulation by the States can patently interfere with broader national interests." *Arkansas Electric*, 461 U.S. at 377, 103 S.Ct. at 1908. The dispositive issue here is whether the APSC's desire to protect Arkansas' interest has resulted in an impermissible burden on interstate commerce.

## IV.

The Attorney General argues that since the APSC has only issued a show cause order, and not actually voided the contracts in issue, there is no significant burden on interstate commerce. The APSC's position in the administrative proceedings surrounding Grand Gulf, however, leaves little doubt that APSC intends to substantially reduce or eliminate AP & L's participation in the project. The threat of enforcement presented by the show cause order is suffi-

cient to support an injunction against further proceedings.

On March 12, 1984, the APSC issued two orders instituting investigations. The first, retrospective in nature, referred to developments in FERC proceedings that "portend[ed] catastrophically enormous rates increases" for AP & L customers. *Arkansas Power & Light Co.*, Ark.Pub.Serv. Comm'n Docket No. 84–040–OII, at 1 (Mar. 12, 1984). The second order, prospective in nature, was to

> look forward to ascertain what the ratepayers of AP & L, AP & L itself, the Commission, the Governor, and the General Assembly may do to circumvent or deflect the economic harm that looms over the State from the imminent prospect of being mandated by a federal agency to pay for a power generating plant that is possibly neither needed or wanted by anyone in Arkansas, * * * and that would, if forced upon the State, potentially result in such immense amounts of excess generating capacity that it could neither be used or sold by AP & L.

*Arkansas Power & Light Co.*, Ark.Pub. Serv.Comm'n Docket No. 84–041–OII, at 2 (Mar. 12, 1984); *see supra* at 408.

Nearly five months later, APSC issued the show cause order that gave rise to this lawsuit. It listed thirty-six agreements relating to the Grand Gulf project, and stated: "The construction of the Grand Gulf Project was and is dependent on the[se] agreements." *Arkansas Power & Light Co.*, Ark.Pub.Serv.Comm'n Docket No. 84–190–U, at 5 (Aug. 1, 1984). The APSC stated that its approval, required by Arkansas law, had not been given the agreements and that some or all were "prima facie violations of Arkansas law." *Id.* at 6. AP & L was ordered to appear and show cause "why all contracts and agreements made by it with respect to any obligations to purchase power from or to pay for construction and operation costs of the Grand Gulf Project should not be held void *ab initio* as a matter of law." *Id.* The APSC later denied AP & L's motion to dismiss the

show cause order for lack of jurisdiction based on FERC's exclusive jurisdiction over the agreements. *Arkansas Power & Light Co.*, Ark.Pub.Serv.Comm'n Docket No. 84–190–U (Aug. 31, 1984).

The APSC argued vigorously before both FERC and the SEC for a reduction or elimination of AP & L's role in Grand Gulf. In an SEC proceeding to authorize the sale of common stock by MSE, the APSC asked the Commission to consider the "discontinuance or moth-balling" of the Grand Gulf project. *Middle South Utilities*, SEC Public Utility Holding Co. Act Rel. No. 23,579 at 9 (Jan. 23, 1985). In litigation before FERC, the APSC sought to avoid the allocation of any Grand Gulf power to Arkansas, claiming that the state does not need and cannot economically use the power. *Middle South Energy*, 26 F.E.R.C. ¶ 63,044 (1984), *aff'd*, 31 F.E.R.C. ¶ 61,305 (1985).[17]

The threat posed by the show cause order is sufficient to warrant the injunction. In *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923), two states brought suits to enjoin West Virginia from enforcing legislation that would have reduced out-of-state delivery of West Virginia natural gas. The Court rejected the argument that the suits were premature, finding that the gas curtailment was "presently threatened and likely to be productive of great injury." *Id.* at 591, 43 S.Ct. at 663. In proceeding to consider the merits of the commerce clause issue, the Court observed: "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." *Id.* at 593, 43 S.Ct. at 663; *see also Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission*, 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983) (decision on preemption of state nuclear-waste disposal law should not be delayed because

postponement "would likely work substantial hardship on the utilities").

■ The mere possibility that a state's interpretation of its law may avoid the necessity for an injunction does not preclude federal review. In *City of Chicago v. Atchison, Topeka & Santa Fe Railway*, 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958), the Court rejected an argument in a commerce clause case that a declaratory judgment should not issue because the state courts had not been given a chance to act. Among other things, the Court reasoned that: "Remission to [state court] would involve substantial delay and expense, and the chance of a result different from that reached below, on the issue of applicability, would appear to be slight." *Id.* at 84, 78 S.Ct. at 1067.

In this case, as in the *West Virginia* and *Pacific Gas* cases, the threatened action is likely to cause great injury, in the form of higher financing costs for MSE. Also, as in *City of Chicago*, the chance of a state adjudication obviating the commerce clause issue is remote. Thus, we conclude that a commerce clause violation can be found notwithstanding that the APSC has not actually voided the agreements. *Cf. Northern Natural Gas Co. v. State Corporation Commission*, 372 U.S. 84, 92, 83 S.Ct. 646, 659, 9 L.Ed.2d 601 (1963) ("[A]lthough collision between the state and federal regulation may not be an inevitable consequence, there lurks such imminent possibility of collision in orders purposely directed at interstate wholesale purchasers that the orders must be declared a nullity."); *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 245, 73 S.Ct. 236, 241, 97 L.Ed. 291 (1952) (Court refused to allow suit for declaratory relief against state commission where no "risk of suffering penalty, liability or prosecution was shown"); *Natural Gas Pipeline Co. v. Slattery*, 302 U.S. 300, 308–09, 58 S.Ct. 199, 203, 82 L.Ed. 276 (1937) (declining to find a commerce clause

---

**17.** Further, after this lawsuit was filed, the following account appeared in the press: "[A]n attorney representing the Arkansas utility commission said the commission staff is confident it can defend its order against the Middle South

suit. He added that "if the APSC voids AP & L's part (of Grand Gulf), the whole thing goes down the toilet." Wall St. J., Sept. 6, 1984, at 7, col. 4–5 (Plaintiff's Ex. 10).

violation in utilities commission merely seeking records, the Court noted that no action based on discovered information was alleged and that it "will be time enough to challenge such action of the commission when it is taken or *at least threatened*") (emphasis added) (citations omitted).

## V.

█ We next consider appellants' argument that Congress has authorized any unconstitutional effect that the APSC's actions may have on interstate commerce. Congress may confer upon the states the ability that they would otherwise not enjoy to restrict the flow of interstate commerce. *Lewis v. BT Investment Managers,* 447 U.S. 27, 44, 100 S.Ct. 2009, 2019, 64 L.Ed.2d 702 (1980); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945). "But when Congress has not 'expressly stated its intent and policy' to sustain state legislation from attack under the Commerce Clause, we have no authority to rewrite its legislation based on mere speculation as to what Congress 'probably had in mind.'" *New England Power Co. v. New Hampshire,* 455 U.S. 331, 343, 102 S.Ct. 1096, 1102, 71 L.Ed.2d 188 (1982) (quoting *Prudential Insurance Co. v. Benjamin,* 328 U.S. 408, 427 (1946)); *United States v. Public Utilities Commission,* 345 U.S. 295, 319 (1953) (Jackson, J., concurring)). Rather, "for a state regulation to be removed from the reach of the dormant commerce clause, congressional intent must be unmistakably clear." *South-Central Timber Development v. Wunnicke,* 467 U.S. 82, 104 S.Ct. 2237, 2242, 81 L.Ed.2d 71 (1984).

█ Ratepayers urge that there has been an "explicit recognition by Congress of the authority of a state to regulate the securities of an electric utility operating within its borders." It is true that the Public Utility Holding Company Act of 1935 (HCA), 15 U.S.C. §§ 79 to 79z–6 (1982), expressly reserves some regulatory powers to the states. Nevertheless, the provisions that Ratepayers rely upon show no congressional purpose to insulate the APSC's activity from commerce clause scrutiny.

The HCA generally requires registered companies and their subsidiaries to file declarations with the SEC that must be approved before securities may be issued or sold. 15 U.S.C. §§ 79f, 79g. Section 79f(b) exempts from the declaration requirement securities of a subsidiary company of a registered holding company, "if the issue and sale * * * are solely for the purpose of financing the business of such subsidiary company and have been expressly authorized by the State Commission of the state in which such subsidiary company is organized and doing business." This narrow exemption obviously envisions a transaction completely different from the Grand Gulf agreements. The documents of concern to the APSC involve all the entities in the Middle South system. They implicate interstate commerce far more than the intrastate dealings between a state commission and a single subsidiary do. Thus, we find in section 79f(b) no express statement by Congress to exempt the APSC's activity from the commerce clause.

A related provision, section 79g(g), provides for state input during the SEC's consideration of proposed declarations:

> If a State commission or State securities commission having jurisdiction over any of the acts enumerated in subsection (a) of section 79f of this title, shall inform the Commission * * * that State laws applicable to the act in question have not been complied with, the Commission shall not permit a declaration * * to become effective until and unless the Commission is satisfied that such compliance has been effected.

Like section 79f(b), this section contains no direction from Congress concerning immunity from the commerce clause.

These conclusions are supported by *New England Power Co. v. New Hampshire,* 455 U.S. 331, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982). In *New England Power,* the Court considered the relationship of the commerce clause to the Federal Power Act. A state utilities commission had sought to

restrict the export of hydroelectric energy generated within the state. The state claimed that this action was not invalid under the commerce clause because a section in the Federal Power Act provided that the Act "shall not * * * deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line." *Id.* § 824(b). The Court interpreted this section as doing nothing more than saving from federal preemption state authority that was otherwise lawful. It concluded that section 824(b)

> is in no sense an affirmative grant of power to the states to burden interstate commerce "in a manner which would otherwise not be permissible." * * * Nothing in the legislative history or language of the statute evinces a congressional intent "to alter the limits of state power otherwise imposed by the Commerce Clause," or to modify the earlier holdings of this Court concerning the limits of state authority to restrain interstate trade. Rather, Congress' concern was simply "to define the extent of the federal legislation's pre-emptive effect on state law."

455 U.S. at 341, 102 S.Ct. at 1101 (citations omitted).

The provisions of the HCA discussed above are facially similar to the statute at issue in *New England Power*. Moreover, the Federal Power Act and the HCA have similar legislative histories. *Compare New England Power*, 455 U.S. at 341, 102 S.Ct. at 1101 ("The legislative history of the [Federal Power] Act * * * indicates that Congress intended only that its legislation '*tak[e] no authority from* State commissions.' ") (quoting H.R.Rep. No. 1318, 74th Cong., 1st Sess. 8 (1935) ), *with Alabama Electric Cooperative v. Securities & Exchange Commission*, 353 F.2d 905, 907 (D.C.Cir.1965) ("The purpose of the Public Utility Holding Company Act, as shown by its legislative history, was to supplement state regulation—not to supplant it."). Thus, sections 79f(b) and 79g(g) do not preclude us from finding a violation of the commerce clause here.

Ratepayers also contend that 15 U.S.C. § 79u saves any commerce clause transgression. This section provides:

> [N]or shall anything in this chapter affect the jurisdiction of any other commission, board, agency or officer of * * * any state or political subdivision of any State, over any person, security, or contract, insofar as such jurisdiction does not conflict with any provision of this chapter or any rule, regulation, or order thereunder.

In *Edgar v. Mite Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the Supreme Court considered whether a state tender offer statute violated the commerce clause. The federal securities laws contained a provision nearly identical to section 79u. *See* 15 U.S.C. § 78bb(a) (1982). There was no suggestion made that this savings provision could authorize state violations of the commerce clause. Rather, Justice White interpreted the statute as leaving to the courts to decide whether similar state legislation may be preempted. 457 U.S. at 631, 102 S.Ct. at 2634. Although Justice White did not speak for the whole Court, *Mite* supports a conclusion that section 79u does not insulate the APSC's actions from examination under the commerce clause.

### VI.

We must next determine the appropriate level of scrutiny under the commerce clause. The Supreme Court has recently applied two tests to state restrictions on the flow of interstate power. In *New England Power Co. v. New Hampshire*, 455 U.S. 331, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982), the New Hampshire Public Utilities Commission sought to restrict the export of hydroelectric energy produced within the state. The Commission's purpose was to contain the cost savings associated with this cheaper form of electrical generation to the citizens of New Hampshire. This savings was to be obtained at the expense of customers in neighboring states that had been sharing the power produced in New Hampshire. *Id.* at 335–36, 339, 102 S.Ct. at

1098–99, 1100. The Supreme Court had no trouble concluding that this sort of "protectionist regulation" was forbidden by the commerce clause. *Id.* at 339, 102 S.Ct. at 1100. Two reasons were cited for reaching this result. First, the utilities commission had made clear that its order was "designed to gain an economic advantage for New Hampshire citizens at the expense of * * * customers in neighboring states." *Id.* Second, the Court found indisputable that the " 'exportation ban' place[d] direct and substantial burdens on transactions in interstate commerce." *Id.* (citing *Public Utilities Commission v. Attleboro Steam & Electric Co.,* 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 54 (1927) ). There was no discussion of balancing the state's interest against the detriment to interstate commerce.

A different analysis was used the next year in *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission,* 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983). At issue was an order of the APSC asserting jurisdiction over the wholesale rates charged retail distributors by a rural power cooperative. The cooperative argued that this assertion violated the commerce clause under the test articulated in *Attleboro,* which invalidated regulations imposing a "direct" rather than "indirect" burden on interstate commerce. 461 U.S. at 390, 103 S.Ct. at 1915; *see Attleboro,* 273 U.S. at 90, 47 S.Ct. at 296. The Court, however, decided to apply "an analysis grounded more solidly" in modern commerce clause cases: "Where [a] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 461 U.S. at 393–94, 103 S.Ct. at 1917–18 (quoting *Pike v. Bruce Church,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) ). After applying this test, the Court upheld the APSC's assertion of jurisdiction.

Thus, the Court has applied a rule of presumptive invalidity to regulations designed to further economic protectionism, and a balancing test, which is far more deferential to the states, to facially neutral regulations. *See generally Baltimore Gas & Electric Co. v. Heintz,* 760 F.2d 1408, 1420–22 (4th Cir.1985) (discussing flux in commerce clause jurisprudence). *New England Power* and *Arkansas Electric* can be harmonized under the following standard: "[W]here simple economic protectionism is effected by state legislation, a virtual *per se* rule of invalidity has been erected. In contrast, legislation that visits its effects equally upon interstate and local business may survive constitutional scrutiny if it is narrowly drawn." *Lewis v. BT Investment Managers,* 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). The "crucial inquiry," therefore, is whether the APSC's action "is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). If a discriminatory purpose is found, there is no need to engage in the *Bruce Church* balancing approach. *Bacchus Imports, Ltd. v. Dias,* —— U.S. ——, 104 S.Ct. 3049, 3055, 82 L.Ed.2d 200 (1984).

■ "A finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose or discriminatory effect." *Id.* In this case, there is ample evidence of both. The APSC seeks to cancel the Grand Gulf agreements ostensibly because they have not received the necessary state regulatory approval. Its apparent concern, which has been made abundantly plain in its orders and its arguments before the SEC and FERC, however, is the economic impact on Arkansas citizens caused by AP & L's participation in Grand Gulf. It seeks to deflect what it has estimated to be rate increases of more than $3.5 billion over the next ten years.[18] Given free rein, the

---

**18.** *See Middle South Energy,* 26 F.E.R.C. at 65,- 097:

APSC would shift this burden to the citizens of Mississippi and Louisiana, citizens who are powerless to directly influence Arkansas' internal affairs.

In *New England Power*, New Hampshire sought to contain within the state the benefits of low-cost power. Arkansas, conversely, seeks to close its borders to high-cost electricity. The effect of both actions is the same: a preference for citizens in the regulating jurisdiction gained at the expense of out-of-state customers. Nor can it be doubted that the APSC's action would constitute a direct and substantial burden on interstate commerce. The integrated nature of MSU and MSE, particularly the Grand Gulf project, represents commerce that is interstate in a most basic form. Thus, this case is controlled by *New England Power*, and the APSC must be prohibited from voiding AP & L's role in the Grand Gulf project. *See also Philadelphia v. New Jersey*, 437 U.S. at 624, 98 S.Ct. at 2535 ("The clearest example of [protectionist] legislation is a law that overtly blocks the flow of interstate commerce at a state's borders.").[19]

### VII.

Finally, appellants assert that the district court should have used its discretion to withhold the exercise of its powers under any of several doctrines concerned with premature federal interference with state proceedings.

■ Under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), for example, a federal court should abstain when the action before it involves matters of state law best left to the state alone. The very premise of this doctrine, however, is lacking when, as here, federal law or Constitution makes the proceeding or regulation at issue beyond the state's authority. *South Central Bell Telephone Co. v. Louisiana Public Service Commission*, 744 F.2d 1107, 1123–24 (5th Cir.1984), *petition for cert. filed*, 53 U.S.L.W. 3449 (U.S. Nov. 30, 1984) (No. 84–870). There is no concern with protecting a legitimate state regulatory scheme, *Baggett v. Department of Professional Regulation*, 717 F.2d 521, 524 (11th Cir.1983), and the question becomes one of basic federal supremacy, which does not turn on local factors or local expertise. *South Central Bell*, 744 F.2d at 1123.

■ Similarly, the rule of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), limiting injunctions of pending state proceedings embodies the principle of our federal system that legitimate state functions be respected.[20] This "comity," however, is not strained when a federal court cuts off state proceedings that entrench upon the federal domain. *Baggett*, 717 F.2d at 524. The legitimate state interest contemplated by *Younger*, *see Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982), does not exist when the state action has been preempted or foreclosed by the Constitution. *Champion International Corp. v. Brown*, 731 F.2d 1406, 1408 (9th Cir.1984).

Because the costs of power from Grand Gulf are perceived to be much higher than the costs of power from other sources on the MSU system, it is not surprising that each of these parties supports an allocation of power which results in the lowest allocation to the MSU operating company or companies in which the party is interested, especially during the early years of operation of Grand Gulf when the costs of Grand Gulf are higher than in later years.

19. The APSC's reliance on *Indiana & Mich. Power Co. v. Michigan*, 405 Mich. 400, 275 N.W.2d 450 (1979), is misplaced, for that case did not involve state regulation with protectionist mo-

tives. *See Michigan Gas Storage Co. v. Michigan Pub. Serv. Comm'n*, 405 Mich. 376, 275 N.W.2d 457 (1979) (companion case).

20. Because of our ultimate conclusion, we may assume without deciding that the *Younger* doctrine, which was developed in the context of state criminal proceedings, applies to the show cause order and proceedings contemplated by the Arkansas Public Service Commission. *See generally Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982) (discussing scope of *Younger*).

Abstention under *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), focuses on whether a decision by a state court might clarify state law so as to make it unnecessary to reach a constitutional issue otherwise presented. Preemption and the commerce clause, however, are matters of federal law, and there is no interpretation of Arkansas law which could make it unnecessary for us to reach the question as to whether the Constitution forecloses even the mere issuance of the show cause order entered here by the APSC. *See Hotel & Restaurant Employees Union Local 54 v. Danziger*, 709 F.2d 815, 832 (3d Cir.1983), *vacated on the merits sub nom. Brown v. Hotel & Restaurant Employees Union Local 54,* —— U.S. ——, 104 S.Ct. 3179, 82 S.Ct. 343 (1984).

Finally, the doctrine of exhaustion of administrative remedies in the context of state agency proceedings simply addresses many of the same concerns which the various types of abstention are designed to reach. *See* 4 K. Davis, *Administrative Law Treatise* § 25:1, at 350 (1983); *see also West v. Bergland*, 611 F.2d 710, 715–17 (8th Cir.1979) (developing factors used in determining whether to require exhaustion), *cert. denied*, 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980).

To the degree that irreparable harm also must be shown, *see West*, 611 F.2d at 719–20, MSE alleges such injury in the form of loss through exhaustion of the very right—the right to be free of the state administrative proceeding—it seeks to protect. The Supreme Court recognized such a right on similar facts in *Public Utilities Commission v. United Fuel Gas Co.*, 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1943), when an interstate gas supplier sought to enjoin the enforcement against it of a state agency order requiring it to prove the reasonableness of the rates it charged a customer utility within that state. Although the agency had done nothing to that point but assert jurisdiction, *id.* at 465, 63 S.Ct. at 374, the Court upheld the injunction on the ground that the supplier suffered injury from the enforcement of the order for proof itself and that the expense of complying with such orders was among the contingencies against which Congress sought to guard in creating exclusive federal jurisdiction. *Id.* at 469, 63 S.Ct. at 376; *see also Public Utilities Commission v. United States*, 355 U.S. 534, 540, 78 S.Ct. 446, 450, 2 L.Ed.2d 470 (1958) ("But where the only question is whether it is constitutional to fasten the administrative procedure onto the litigant, the administrative agency may be defied and judicial relief sought as the only effective way of protecting the asserted constitutional right."); *Panhandle Eastern Pipe Line Co. v. Public Service Commission*, 332 U.S. 507, 512, 68 S.Ct. 190, 192, 92 L.Ed. 128 (1947) (state agency order requiring interstate gas supplier to file certain tariffs, rules, and regulations was not just a threat to apply the state regulatory plan but constituted actual application of the plan in its initial stages); *cf. Monahan v. Nebraska*, 645 F.2d 592, 597 (8th Cir.1981) (claim that state procedure itself conflicted with federal act could not be effectively addressed by exhausting state procedure).

 Here the mere assertion of jurisdiction by the APSC had a negative impact on MSE's ability to obtain investors and complete its project, thus similarly interfering with the exclusive federal scheme for governing interstate power transmission and sales. And, as in *United Fuel,* we observe that MSE raised the preemption question before the APSC in a motion to dismiss the show cause order for lack of jurisdiction and only filed this suit when such motion was denied. 317 U.S. at 470, 63 S.Ct. at 376 (distinguishing *Natural Gas Pipeline Co. v. Slattery*, 302 U.S. 300, 58 S.Ct. 199, 82 L.Ed. 276 (1937)). We thus conclude that neither the failure of MSE to pursue further state remedies nor the abstention doctrines of *Burford, Younger*, or *Pullman* make the district court's resolution of this case an abuse of discretion. Nor are we convinced that the district court improperly determined the need for equitable relief or the scope of the injunction.

The judgment of the district court is affirmed.